May it please the court, for the record, your honors, my name is David Anditch, and I represent the petitioner at Apollon, Peter Mannon. As the court knows, this is a case that arises before it from a post-dissolution decree and a hearing before Judge Charles Stangle in our court. And the facts, the underlying facts that created the post-judgment hearing were undisputed. And if I could just say very briefly, in January 2006, the party's marriage was dissolved with respect to maintenance, which is the key issue before the court. And whether Peter Mannon was properly held in contempt and what the maintenance should be or should be reduced to, he agreed to pay a total of $55,000. $38,500 would be maintenance, $60,500 would be child support. It's clear from his testimony in the parts of a two-day hearing that that number was 45%, and that that's what he believed the agreement was, that he would continuously, as long as he had five children, he would be paying 45% of his net monthly income in some combination of maintenance and child support. At the time that he entered into the agreement and the divorce decree was entered in January of 2006, he worked for a company with an acronym of CMA, Control for Motions Automation. He was a high-tech salesman is what it was. He was making very substantial income. In fact, there's no dispute about any of the facts in any of the incomes throughout the four- to five-year period that's involved in this case. But when it was entered into, he was making an income of $147,000. He paid, made every payment, every cent that was owed, came down to on a monthly basis. He was paying $1,375 in child support, $3,208 in maintenance a month, or $4,600 a month. For 15 to 16 months, he made – he paid every cent of what was owed in both. In May of 2007, he gets a position of massive job insecurity. He's informed that his company is going to merge here, CMA is going to merge. He's told after holding a job for 14 years that he doesn't have a guaranteed position with the new company. He's going to have to reapply for employment, and he feels quite scared is how he – what he testified to about looking at a $55,000-a-year court-ordered obligation for maintenance and child support, and he may or may not have a job. He's contacted by an Arizona company, Peterman, who describes it as a sister company, and the president of that company makes it clear to him – and this is not rebutted by any testimony whatsoever in the case – that the position he's being offered in Arizona at Interstate Hydraulics is virtually the same technical sales position at the same salary, and it's a guaranteed position. So he has to figure out what he's going to do. He has five kids to support, and – He wasn't fired or discharged. No. And he didn't call anybody else. It was only his testimony. That is correct, Your Honor. But it was not refuted or challenged by any piece of evidence, by counsel, or by any testimony. Well, let me ask you. Sure. I mean, would you agree that – I mean, it seems that this whole appeal boils down to your client's state of mind at the time he changed jobs. Would you – would that be too simplistic? With all due respect, Your Honor, I think in large part it is. I mean, only in the sense of – I think that that's only an issue with respect to Judge Stengel's findings on whether the job change was voluntary and in bad faith. So those are sub-issues of the contempt issue. Okay. Okay? Right. But doesn't it all – I mean, in other words, this all hinges from Judge Stengel's finding that your client was – changed jobs and reduced his income in bad faith. Those are voluntary – Yes. Those are two of Judge Stengel's findings. That is correct. The ultimate question, of course, is whether in the course of four years from – he was current through May of 2007 until the hearing in May of 2010. The question is did he intentionally, willfully, and contumaciously refuse to pay $47,000 in maintenance? He's a guy who paid $177,000 over that period, Judge. Okay. So – That's up to me. Now, so my next question is where's the burden of proof here at trial as far as your client's willfulness or lack thereof as far as not paying or taking the – becoming – his income being reduced? At trial, Judge? Yes, sir. Okay. At trial – I mean, the standard procedure under the statute is for a rule to issue by a trial judge, which raises a prima facie case that somebody, including Peter Manin, is in contempt of court. And I believe, quite honestly, at that point, the burden shifts to my client to come to court and prove that over whatever time period is involved, he did not intentionally or willfully, as that term is defined in contempt, refuse to pay the amount of money ordered by the trial court earlier. So I think the initial burden in the courtroom, like this courtroom, is on my guy, Peter Manin. All right. So Judge Stengel found – I'm sorry, go ahead. No, that's all right. Finish up. Obviously, Judge Stengel found that he was wilful. Yes, he did. So what are we going to do about that here? I hope you're going to reverse it because there are numerous decisions by the courts of the state of Illinois that involve – I'll call it, for lack of a better term, partial payment of child support or maintenance. And they've reversed – the cases that I saw at my brief show that they have reversed the trial court judges regularly on the basis that a failure to not make – pay every cent isn't always contemptuous. It's not only – not always willful. And if Your Honors read one case, or if I have my choice to give you one case that I urge you to read before you rule and make a decision in this case, it's your own decision in 1976 in White v. White. I hesitate to use the old phrase from law school, Judge, that it's a cow case on all fours, but it happens to be an appeal before this court by a person who is in strikingly similar situation to what Peter Manin was in. He was held in contempt by the trial court. This court reversed it. He had paid a substantial amount of his maintenance. He couldn't pay all of it. The trial court gave him a 25 percent reduction on the motion to reduce, which is also part of our case, Judges, gave him a 25 percent reduction in the child support. They held him in contempt anyway for not being able to pay every dollar of his maintenance. This court reversed. In White, did the trial court make a specific finding that the witness was not credible? Do you have a finding in White that the husband was not credible? No. Don't we have that here? If we do, Judge, I didn't see it quite frankly. It may be I wasn't the trial court judge or lawyer. That's no excuse for not seeing a judge. But with all due respect, if Judge Stengel found that he wasn't credible, I missed it. And it's not in these briefs, my briefs, and it's not in opposing counsel's brief. It's in the record that the trial judge found not to be credible. I guess, you know, it's happened before, but I submit to the court. It is a different kind of finding when the facts are unrebutted and the trial judge, you know, he isn't relying on testimony of Kimberly Manning. He isn't relying on any other evidence in the record. He's saying, I don't believe I just don't believe this client. Does he have the power to do that? I suspect he does have the power to do that. But do I think it factors into whether he abused his discretion? There's no other evidence to offset. You know, they didn't subpoena any records. Who has the burden of proof? Do they have the burden of proof on this issue? I believe they have the ultimate burden of proof. I believe rests with them. They say my guy is in contempt of court. Justice Schmidt asked me the question, who has the burden to begin? Your fellow didn't pay the money. I'm sorry? Your fellow didn't pay the money. Absolutely correct, Justice. And he found him in contempt of court because of that. The $11,000 tax refund, isn't that right? One day out of 1,500 days. That's correct, Judge. He didn't apply that amount of money to anything on the arrears. Yeah, that is correct. And there is not any evidence in the record, Judge, as to what his obligations were on that day. There's no testimony in the record as to what he did with the $11,000. It's very obvious what he did from the totality of the record. Did he testify what he did or what happened to the $11,000? No, absolutely not. And who should have done that? I don't think it was his burden to testify what he did with it. He testified that he got a tax refund check, Judge. The real issue is, isn't it your burden to show cause, if you can, why you should not be held in contempt? Yes. Isn't that the law of contempt? Yes, absolutely. So shouldn't you think he should have done something about the $11,000? I mean, that was a specific finding by the trial judge, was it not? It was that the trial judge said he could have paid something. He doesn't say what amount he could have paid, Judge, out of that $11,000. He says nothing about the fact that my guy, the record is undisputed. He has $45,000 in credit card debt on the day of the hearing. That's not in dispute. He has enormous expenses. He's paying $3,500 a month anyway, Judge, in his maintenance and in his child support obligation. This is not a deadbeat dad case. I've had plenty of those. We've all had plenty of those. This is not one of those cases. He's paying $3,500 a month in child support and maintenance. He has terrific obligations. He has a new marriage out in Arizona. He has a stepson who's handicapped. That's all part of the record evidence. The guy was just like White was before this court. And this court makes some very perceptive statements about a guy who got in too deep in the property settlement. It is a replica. Peter Manning did exactly what Mr. White did in that case. Thank you. He estimated or overestimated what his income would continue to be, just as Mr. White did in that case. It didn't turn out that way. Nobody has a crystal ball. But he continues to pay $3,500 a month and gets held in contempt of court. I respectfully disagree a lot. How many kids were there? Five kids. And if I could just spend a minute and a half on the motion to reduce maintenance. The maintenance was $38,500 a year, a huge maintenance award. Judge Dingell takes $6,000 off, even though the evidence was in 2007, 2008, and 2009, he couldn't pay between $9,000 and $17,000 each year in maintenance. So Judge Dingell gives him a $6,000 reduction. Well, I mean, and the reason Judge Dingell says he does that isn't because my guy's income goes down from $150,000 to $75,000 or $90,000 or whatever. He doesn't care about that. Judge Dingell says I'm reducing it $6,000 because Kimberly Manning has a job and a college degree and is getting $12,000. Judge Dingell doesn't say a word about my guy losing 35% to 50% of his income as a basis to reduce the maintenance. He reduces it by $6,000, which is the petition for maintenance was filed three years before. And under the law and the statute, he had every right, the judge had every right to go back to the day of filing when they were given notice. The opposing side was given notice that they were seeking a maintenance reduction. Instead, Judge Dingell goes back one month. Why did it take three years to get that motion to hearing? Peter Manning testified, Judge, he didn't have the money to get back here for the hearing. That was his testimony. He couldn't afford it. I mean, it's damned if you do, damned if you don't. He can't afford the airplane ticket and he can't afford the maintenance. So, you know, he's in a dilemma without a doubt. But that was his testimony, Judge, that he couldn't afford to get back here. And then he had no choice once the contempt petition was filed. And there were two pending contempt petitions, plus the petition to reduce maintenance. So it got set finally by his trial court counsel. And I'm not going to stand here, Judge, and say that I applaud not presenting a motion to the court for three years. I don't think that's the way that it should have been done. That is the way it was done. And the judge had authority, and I believe absolutely abused his discretion, in not going back to implement the maintenance order and the $6,000 reduction for three years instead of just one month. I would urge, I'm not sure if I'm done or thrown off or. That's all right, Dan. Justice McDade. You asked my question. It was asked. Thank you very much. We would urge the court either to reverse Judge Stengel here or reverse remand for reversal in the trial court. Thank you very much, Your Honors. May it please the court, counsel. I'm Donovan Robertson, and I represent the respondent, Kimberly Manning, here on appeal today. I think as is clear from the first part of the argument, a lot of what's going on here in this case has to do with choices that were made and choices that were made by Peter Manning. And many of those choices were made unilaterally, including his leaving his job, his choice to unilaterally lower the amount of support that he was paying, and his choice not to pay any money when he received his income tax refund in 2008. I'd like to start and talk just a little bit about his leaving his job. He'd been 14 years with his company in Geneseo. Justice Smith, I think you'd ask the question whether he was fired or discharged. He was not. That's in the record. And that is his own testimony. He gave some testimony of dire economic forecasts for the Geneseo area. None of that was supported by anything other than his own testimony. And I think it is important to note that Judge Stengel, in ruling on this particular issue, said the issue is whether or not the petitioner willingly, voluntarily left his job, and that made a detriment for his inability to pay the maintenance. Or did he have a choice? Judge Stengel goes on to say, I have no other testimony than his word. And that's at page 79 of the record of the contempt hearing. And what I'm inferring from that is Judge Stengel is saying, I'm not finding you credible here. All I have is your word, and I'm not ruling in your favor. I think that's a credibility finding. And I think this court must give deference to Judge Stengel's finding in this regard. Secondly, Mr. Manning decided to lower his support, to unilaterally lower it, to not pay as much as he was paying. And, again, he had the ability to file a petition to modify. He did file a petition to modify two years after he left his job. That petition was never heard until last year. And I think that perhaps his choice not to purchase an airline ticket is, again, another unilateral choice made by Mr. Manning that may not have been in his best interest. Well, that may be so. But let's look at some of the other choices he made. By our math, it looks like in 2007, for example, his net income was $64,851, and he paid your client $46,311. That's 68% of his net income that he paid. That's correct. I mean, Justice Schmidt, it seems to me that when we start out and look at this case, the statute, the child support statute, would tell us that 45% of his net income should be assigned to child support alone without even the question of maintenance coming into it. He's getting a break from the get-go here because his support and maintenance is unallocated. Well, actually, it's allocated $38,500, I believe, to maintenance, which gives him about a $7,000 tax break, if my math is correct. He's actually paying less than someone who is just paying statutory child support. Additionally, I think if you look at his income records as set out in both briefs, yes, he does have a bad year after he goes to Arizona, a consequence of his choice to leave a job which he had that was paying more. But moreover, he's coming back. By 2009, he's earning $114,000 a year. And the case law teaches us that the burden of a bad choice in that regard, temporary loss or perhaps permanent gain, should not be foisted upon the custodial parent. Well, but when we look at these underemployed cases where somebody says I can't, it's not so much that they made the voluntary choice to change jobs. It's if they need a finding that they kind of did it with the intent to reduce their income, to defeat their divorced spouses or their child support obligation or something like that. It's not that he left the job voluntarily. It's kind of what his state of mind is where he does it. I'll show them, I'll just reduce my income here because I don't have to pay as much. That's what those cases are really about. It's not doted. Some of those cases are. But, and I'm not sitting here and arguing that I think, I mean, we've all heard it in matrimonial practice. If I have to pay that amount of support, I'll quit my job. And by golly, some people do it. But that isn't this case. And I'm not saying that's this case. I'm saying that Mr. Manin made a poor choice in leaving a good job and that now the birds have come home to roost. And again, I think this is part and parcel of Judge Stengel's decision that he did not believe Mr. Manin entirely, that his choice was just to, shall we say, do a preemptive strike in the employment area. You have to go back and look at the facts that he did leave a $147,000 a year job. Did he apply for the job with CMA? With Control Motion? Yes. Yes, I believe he did. He made an application to continue in that job? Yes, I believe he did. And if I'm wrong, counsel will correct me, I'm sure. This defense, essentially this defense comes down to poverty, inability to pay. And again, the case law teaches us that, and I'm looking at the Betts case, which was cited in both briefs, that this defense of inability to pay is one that should rarely be used. It's, again, I think relates to this case, and we're kind of looking at a snapshot, that first year or two after he left Geneseo and went to Arizona, his income was down. But again, I think that should not be foisted upon the custodial parent. And I still think that he could have applied for one job when he left. I believe that is correct. I believe it was like a prearranged thing, is what I believe. And then, though, he went and changed jobs again to try to sort of meet a bad choice. But it's kind of a law of nature that if you enjoy your lifeblood from the host, you don't want to kill the host, right? And, I mean, in 2007, after paying $46,000, this guy's living on $18,000 net income. Clearly he is. Now, it doesn't look like a guy who's intentionally trying to defeat, you know, to not pay his obligations. Well, I think that's true. And I'm not arguing that he was intentional. I don't think that's the standard. I think part of it is good faith, you know, in the traditional sense. But I think good faith also has a component of am I making decisions in the best interest of those six people who are depending on me? And I don't think he did in that regard. And, again, I go back to Judge Stengel's finding in that regard. And I also wanted to point out, too, something that Justice Carter talked about, and that was the contempt finding here. He wasn't found in contempt for not paying the entire $47,000. As I read this record, he was found in contempt for failure to pay. And if you look at the order, it doesn't even say all of the $11,000. It says some or all of the $11,000 that he got from the tax refund. He chose not to pay any of it. And I think that's why he was found in contempt. And I think that's borne out by Judge Stengel's order below. I also wanted to point out Mr. Anditch had asked you all to look at the Wills case. And I think the Wills case is an important case. But there is a difference between the Wills case and what's going on here. In Wills, that involved an agreement that was reached, the very first agreement that was reached. It was ill-advised. And from the beginning, based upon the evidence that was presented to the appellate court, there was no way that this gentleman could have complied with the order. And I think that is distinguished here in that initially when this order was entered into, Mr. Manifestly could comply with it. And I'm not arguing either that's not a lot of money. But, again, our statutes require that in cases with this many dependents, a lot of money be ordered. So I do think Wills is distinguishable from the case at bar. If there are any questions, I would try to answer them for the justices. Well, let me ask, it seems there was a finding, again, that I think by Judge Stengel, that the appellant's job change was in bad faith. Yes. And what was the basis of that finding? I believe, and again, I quoted the passage that Judge Stengel stated, and my belief is that Judge Stengel felt that there were other reasons for the move other than simply the change in appointment. I can't get inside Judge Stengel's mind, but the way it was stated when he said, All I have is his testimony. I don't have anything else. That's telling me I don't believe you. I think there are other reasons. And I don't know what those other reasons are that Judge Stengel may have found. Again, I think he's making credibility finding there. And I – Would you at least agree that a reasonable person could look at this record and make it look like the appellant was trying to make this move, Arizona Ward, one job didn't pan out as he said he thought it should. He changed jobs, increased his income, and started making things better. Yes, just as I would have to say that I think a reasonable person could take the view taken by Judge Stengel. Yes, I do agree with what you're saying. But I think, again, we are one level away from that. Thank you, Your Honors. Counsel. Thank you, Your Honors. Just several brief comments I expect. I wanted to comment on Mr. Robertson's suggestion that, as I understood it, he said, the inability to pay defense, Justice Schmidt, should rarely be used. I don't know of any case that says that. I don't think it is the law. And I believe that if there is ever a case for the inability to pay, other than some person who is completely bankrupt and doesn't have a dime, this is at the other end of the spectrum. This guy has no ability to pay. He's paying a huge percentage of his net monthly income for four years. The average is 54% a year of his net monthly income. And the guy can't pay it. That's the inability to pay defense. Well, in the finding of contempt at the trial level, you can be found in contempt not because the judge finds that you had to pay every cent, but you could have paid part of what you didn't pay. And that's what happened in this case, isn't it? The trial judge said that you got a tax refund of $11,000, and I quote, so you did have the ability to pay something, and you didn't. Isn't that what he said? That is what he says. But I believe, Your Honor, that you can't analyze this case fairly and do justice to these parties and determine the correctness of Justice Stengel's decision if you say that Peter Manin is in contempt of court because one day out of 1,500 days, he got a check for $11,000, and he concluded on that day, under the financial stress that he's under for this four-year period, to do something else. Obviously, he paid bills. The record is replete with all these financial records. This guy should be in bankruptcy. And instead, he's struggling like he struggled to make these payments. And, I mean, if you're asking me, Justice Carter, is it legally possible on a set of facts to find a person in contempt of court because he pays some but not all of what's owed, I have to say absolutely, there's no doubt about it. It could be, and every case is fact-specific, obviously. So I just ask the court that I believe you judge cases on the totality of the facts and the entire time period involved. And in this case, it's between four to five years in judging Peter Manin's performance, whether he's in contempt of court. And with all due respect, I find it extremely difficult to accept the fact that this guy can pay the money that he paid, $177,000, in maintenance and child support over four years, averaging 54%. And Judge Stengel can say that he intentionally and willfully failed to comply with that order over that four-year period? I don't buy it, with all due respect. Did he make a finding like that over a four-year period? Wasn't the finding about the $11,000? And that's part of my objection, what I claim is there. That's absolutely right. Because I believe the judge didn't look at the four-year performance of Peter Manin. He looked at one day, and without any other facts on that day, in terms of what the expenses were or what was more important, he says, you could have paid some portion. Judge Stengel doesn't even say it could have been $5. He doesn't say it could have been 50-50 at the $11,000. He says nothing about it. He says you could have paid something. Well, I believe, Your Honors, with all due respect, you don't just consider one day in this case, in whether he's in contempt of court of an order that's entered in January of 2006, you consider four years of his performance. I submit that four years of Peter Manin's performance, it was extremely good. And I personally think it's outrageous he was held in contempt of court. I've been doing this for 37 years. I'm utterly shocked by this ruling, and I think it should be reversed. Mr. Randage, he, in a sense, voluntarily maintained the order that he was how much he was required to pay by not following through on the petition that he filed in 2007. I'm sorry, Justice McDade. Could you say that again? He filed a petition in 2007 to reduce Yes, he did, March of 2007. That's correct. He didn't do anything about that petition until 2010. That is correct. So he could have done something to reduce the load that he had and made it more manageable three years earlier. Absolutely, Judge, and I think there is two issues there. Peter Manin testified he didn't have the money to come back here and take away from work when he's trying to support two different families. And secondly, Judge, he certainly was entitled to rely on Illinois law that clearly states and this court and other courts have clearly held that it is common practice when a motion is granted and this motion to reduce maintenance was granted. Peter Manin won that motion. Even Judge Stengel concluded $38,500 made no sense at all. It is common practice throughout this state from top to bottom, Justice McDade, when you prevail on a motion on child support and maintenance to reduce it or increase it, judges uniformly make it retroactive to the date of filing or the date of service. That isn't my point. I'm sorry. My point was that He could have done something. Yes, he could have. And I'm sorry, plane ticket, four years' worth of reduced things that he has to pay. It seems to me that he just voluntarily left himself open. With respect to that issue, Judge, which is about my sixth error claimed by Judge Stengel that he made it retroactive for only one month rather than three years from the date of filing, that is my sixth issue. It has nothing to do with the contempt. It is strictly about one aspect of his maintenance ruling in reducing it the day it should have started. Yes, you're correct, Your Honor. Thank you very much. Thank you. The Court will take this matter under advisement and rule with dispatch and we'll have a panel change for the next case. Thank you.